## GUNTZVILLER *v.* GITRE.

1. EQUITY—PLEADING—VARIANCE.

   Allegations in a bill which are not supported by proof do not prevent relief if there are allegations supported by proof which are sufficient grounds for equitable relief.

2. QUIETING TITLE—EQUITY—SPECIFIC PERFORMANCE—PLEADING—CROSS-BILL.

   Where a bill alleged the execution of certain deeds conveying certain premises to plaintiff upon condition that he pay a certain sum of money to each of the defendants; that plaintiff had offered to perform these conditions; that defendants had refused to accept the money, and that they asserted the mental incompetency of the grantor, and threatened to litigate with the plaintiff, *held*, that the bill was sufficient for relief if such allegations were proved, although other allegations were unproved, especially where a cross-bill put squarely in issue the question of the validity of the deeds.

3. WITNESSES—MATTERS EQUALLY WITHIN KNOWLEDGE OF DECEASED—EVIDENCE.

   Under the provisions of 3 Comp. Laws, § 10212, as amended by Act No. 30, Pub. Acts 1903 (3 Comp. Laws 1915, § 12553), relating to the inadmissibility of evidence as to transactions with deceased persons, the testimony of plaintiff's mother, who was an agent of plaintiff, and also that of plaintiff and his wife as to facts equally within their knowledge and that of plaintiff's deceased grandaunt concerning a contract between plaintiff's mother and the decedent sued on by plaintiff, is incompetent.[1]

4. DEEDS—COMPETENCY OF GRANTOR.

   An instrument testamentary in character or effect disposing of property is not to be set aside merely because the grantor or testator is old or weak or foolish or lacks the average mental capacity of his neighbors or relatives, if he .possesses sufficient mentality to know and understand the transaction, the extent and value of his property,

[1] On the applicability or rule excluding testimony of interested person in controversies over succession to estate see extensive note in 51 L. R. A. (N. S.) 187.

those who are the natural objects of his bounty, is able to carry in his mind the general scope of the instrument and its effect, and to whom he is giving and from whom he is withholding.[1]

5. SAME—EVIDENCE—COMPETENCY OF GRANTOR—SPECIFIC PERFORM-
ANCE.

Evidence *held*, sufficient to show that plaintiff's deceased grandaunt executed certain deeds conveying to him certain property and transferred to him a certain amount of money in consummation of an agreement therefor upon certain conditions on the part of plaintiff which he had fully performed or offered to perform, and that decedent was mentally competent at the time she executed such deeds.

Appeal from Wayne; Hosmer, J. Submitted January 9, 1917. (Docket No. 66.) Decided April 9, 1917.

Bill by George Guntzviller against Joseph Gitre and others for a quitclaim of defendants' interest in certain real property. From a decree for plaintiff, defendants appeal. Affirmed.

*James H. Pound,* for plaintiff.

*Ormond F. Hunt,* for defendants.

FELLOWS, J. This bill was filed February 24, 1913, and its material allegations are substantially as follows: That Catherine Williams, Mary Ann Williams, Mary Williams, and Maribarb Williams were sisters. They came to this country, and a short time after their arrival purchased 25 acres of land of one Henry Rummley; that they were grandaunts of plaintiff; that upon the birth of plaintiff these grandaunts importuned his parents to permit them to adopt him, but his father declined to permit his son to go by another name, when they proposed to take plaintiff, raise him, and that he should have their property at

[1] On what constitutes capacity or incapacity in making of will see notes in 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444.

their death; that this proposition was accepted, and that it was agreed that plaintiff should be taken by these grandaunts, who were maiden ladies, as soon as he was able to be taken; that he was so taken by them upon their farm, and was raised by them; that Catherine died, leaving her property to the surviving sisters; that Mary Ann did the same; that Mary died leaving her property to Maribarb; that Maribarb had endeavored to carry out the agreement so made with reference to plaintiff by deeding to him, on May 7, 1907, the southerly 13 acres of the farm, in consideration of $200 to be paid for church services for her sister, which plaintiff alleges was paid; that on the 24th of January, 1908, the balance of the land was deeded to him upon condition that he pay $150 each to Maggie Guntzviller, plaintiff's mother, Josephine McHugh, Phinea Flanagan, Mary Cronin, and Joseph Gitre, which condition he accepted, and has offered to pay each of the defendants the $150 but they have refused to accept the same, and threaten to litigate with plaintiff. He also alleges that until he was married he received no salary or compensation, except spending money; that after his marriage he still did all the farm work and cared for his aunts, obeyed their orders, buried them, and paid for their burial and their other debts; that defendants, together with plaintiff's mother, constitute all the heirs at law of Maribarb, and that .defendant Joseph Gitre has had himself appointed administrator of Maribarb's estate, and threatens to set aside the deeds to plaintiff on the grounds of mental incapacity. He alleges that he is entitled to specific performance of the agreement under which he claims Maribarb and her sisters got 20 years of his life work. The prayer of the bill is for a decree requiring defendants to quitclaim their interest in the land in question and for general relief.

The defendants by their answer deny all the mate-

rial facts alleged in the bill of complaint, claim the benefit of a cross-bill, and pray for affirmative relief. This pleading is not questioned, so it becomes unnecessary to set forth the allegations in it with the particularity with which we have detailed the allegations of plaintiff's bill which is questioned, and it will be sufficient to say that they allege that Maribarb had been feeble-minded from childhood, was mentally incompetent to, and did not, transact any business; was not mentally competent to execute the deeds in question, and that if she executed them, they were procured by fraud, duress, and undue influence; that in addition to the land in question plaintiff procured from Maribarb $2,000 in cash by means of fraud, duress, and undue influence and when she was mentally incompetent to transact business; that defendant Joseph Gitre has been duly appointed administrator of her estate. They make Eda Guntzviller, wife of plaintiff, party to the suit, and pray for the cancellation of the two deeds and an accounting to the administrator for the money. Plaintiff and his wife, Eda, answer this pleading by denying all the material allegations, and they set up that Eda has furnished about $2,000, most of which has gone into improvement of the property in question. Upon application to the court an order was entered, permitting Joseph Gitre to also appear in his representative capacity as administrator of the estate of Maribarb.

In the record the grandaunts are called Wilhelm, and the one named in the bill as Mary Ann appears as Mariann. We shall refer to them hereafter as the record discloses their names to be.

We shall first discuss the legal objections raised to the bill and the admissibility of evidence. The defendants first urge that the bill cannot be maintained because there is a fatal variance between plaintiff's case as set forth in his bill and the testimony adduced upon

the trial; that the plaintiff has failed to establish the existence of the contract between the aunts and plaintiff's parents. They urge that the bill is one for the specific performance of such contract, that plaintiff's title cannot be quieted unless he establishes such contract and his right to its specific performance. It has been held by this court that surplusage will not render a bill multifarious; that a bill is not multifarious if in stating a case for equitable relief it contains allegations with reference to other matters insufficient to entitle complainant to relief with reference thereto. *Wheeler* v. *Manufacturing Co.*, 162 Mich. 204 (127 N. W. 332). So we hold here that allegations in a bill which are not supported by proof do not prevent relief if there are allegations supported by proof which are sufficient grounds for equitable relief. We think the allegations of the execution of the deeds by Maribarb Wilhelm to plaintiff with the conditions therein contained, the offer to perform these conditions on the part of plaintiff, defendants' refusal to accept the money, their assertion of the mental incompetency of Maribarb, and threats to litigate with plaintiff state a sufficient case for equitable relief. In addition to that, defendants, by that part of their answer which claims the benefit of a cross-bill, put squarely in issue the question of the validity of the deeds. *Schmidt* v. *Gaukler*, 156 Mich. 243 (120 N. W. 746). This objection of defendants is untenable.

To establish the contract with the Wilhelm sisters set forth in the bill, the plaintiff produced as a witness his mother, Margaret Gitre Guntzviller. The defendants insisted in the court below, and do here, that her testimony as to facts equally within the knowledge of the deceased was incompetent under the provisions of 3 Comp. Laws, § 10212, as amended by Act No. 30, Pub. Acts 1903 (3 Comp. Laws 1915, § 12553). They insist that the question is controlled by the case

of *Albring* v. *Ward*, 137 Mich. 352 (100 N. W. 609). With this contention we agree. In that case the complainant produced as a witness her father, John Bennett, to testify that he made an arrangement with deceased, to the effect that if he (Bennett) would relinquish to deceased all claim to the custody, care, and control of his daughter and all his rights as her father, the said deceased would make her his heir at law, and that at his death she should inherit a share of the property as if she were his natural child. This court said, speaking through Mr. Justice GRANT:

"But this testimony of the father is inadmissible under Act No. 30, Pub. Acts 1903, which provides that no person 'who shall have acted as an agent in the making or continuing of a contract with any person who may have died, shall be a competent witness in any suit involving such contract.' If any contract was made, it was made by Mr. Bennett on behalf of his daughter. A more appropriate case for the application of the law cannot well be imagined."

The instant case is not, in any way, distinguishable from that case, and the rule there announced is controlling. Mrs. Guntzviller was not a competent witness to prove the arrangements made by her with the Wilhelm sisters for the benefit of her son, the plaintiff. The testimony of the plaintiff and his wife as to facts equally within the knowledge of deceased was also inadmissible under the provisions of 3 Comp. Laws, § 10212 (3 Comp. Laws 1915, § 12553).

It is unnecessary for us to decide, and we do not decide, whether, in view of the relations of plaintiff with deceased, the burden of proof rests with him, as we are satisfied that the determination of the case does not depend upon the balancing of presumptions, and that the proof is clear and convincing as to the controlling facts.

The testimony is in conflict and at times acrimonious; we cannot, in this opinion, attempt to detail it,

and will content ourselves with a statement of the facts we are satisfied it establishes.

Catherine, Mariann, Maribarb, and Mary Wilhelm were sisters, all born and lived, until they were somewhat along in years, in St. Louis in Alsace-Lorraine. They had relatives living in Detroit and vicinity. Mary, the youngest, came to this country with her brother George, the understanding being that if she liked the country some one should be sent to the old country for the others. In 1874 the defendant Joseph Gitre, a nephew, went after them. They reached here in the fall. Maribarb at that time was 42 years old. They brought with them $4,500 in gold, and soon after purchased the land in question, consisting of about 24½ acres located in the township of Greenfield, near Detroit, for $2,500. The title to these premises was taken in joint tenancy, with the right of survivorship. The house on the premises was an old log one, and they built a new one, and largely conducted the work on the farm themselves, hiring some help. They appear to have been frugal and industrious. The plaintiff entered this household when he was about 2 years old. Eliminating the testimony of his mother, as we must, we are unable to find testimony in the case of the contract with these aunts as alleged in the bill; but the record furnishes abundant testimony that they treated him as if he were their child, regarded him as a son, expected he would always remain with them, and expected to leave him all, or a considerable portion, of their property. It is apparent that they wanted a child in their household, that they realized that in their later life they would need some one to care for their wants, and that this end would be attained much more surely by raising a child than to depend upon distant and indifferent relatives. They all realized that plaintiff should have compensation, and frequently expressed to neighbors and friends their intention to leave him their property.

We think the testimony establishes a settled and fixed intent on the part of these maiden aunts, from the time he entered their household, to leave practically all their property to plaintiff, and the testimony that at times he did not get along as well with Mary as the others, and that on her deathbed she made a will giving him less, and the other relatives more, than the final disposition made by Maribarb, does not counterbalance the testimony of the many neighbors, to whom the sisters talked and to whom they related their fondness for plaintiff and their intent to give him their property.

Plaintiff as a boy went to both district and parochial schools; he did chores and helped on the farm; he was given spending money by the aunts, and treated and provided for as a son would have been. As he grew older he worked on the farm, and in the fall of 1903 he married. For a few weeks he lived across the street from the Wilhelms, but he and his wife soon took up their home with Mary and Maribarb, the then surviving sisters. Afterwards he rented another farm, which he worked in addition to the land in question, and for a time he and his wife lived on the rented place, but he continued to do whatever was needed for his aunts' comforts and necessities. We think the preponderance of the evidence establishes that he was industrious, and while he occasionally drank, he was by no means dissipated, and treated the aunts well. While they may have had occasional troubles, they were by no means serious. He endeavored to, and did, look after their needs to their satisfaction and was to them the comfort and assistance they had planned for when he entered their home.

The sisters did not speak the English language, and only Mariann and Mary could understand it, and they quite indifferently; most of the neighbors and witnesses, however, could converse in German; they used

that language in talking with the Wilhelms, and are able to relate their conversations. Catherine was an invalid for a number of years, and died in 1896; Mariann died in 1903, and Mary in April, 1907. Shortly after Mary's death Maribarb conveyed to plaintiff and his wife the southerly 13 acres of the land in question; $200 was to be paid by plaintiff for church services for Mary, and it was so paid. About this time she caused her account at the bank to be changed to a joint account with plaintiff, thus giving him authority to withdraw the same. In January following she conveyed the balance of the land to plaintiff and wife. This conveyance was conditioned upon the payment by the grantees, within 2 years, of the sum of $150 to each of the following persons: Maggie Guntzviller, Josephine McHugh, Phinea L. Flanagan, Mary Cronin, and Joseph Gitre. Both of the deeds were drawn by Anthony Grosfield, who appears to be perfectly disinterested. He understood and spoke German. The instructions given by her were in that language, and after he had completed the documents they were explained to her in her native tongue. Both he and the witnesses to these instruments testify to her mental capacity, and that she fully understood the transactions. After their execution they were placed on record by Mr. Grosfield. Plaintiff paid the $150 to his mother, and offered payment to the others, but they refused to accept the same. Plaintiff and his wife continued to care for her down to her death, which occurred nearly 5 years after the execution of the last deed, and when she was 80 years of age. During all this time she was contented, and frequently told her friends that she had conveyed her property to plaintiff; that plaintiff was to care for her as long as she lived, and expressed her entire satisfaction with the arrangement.

We are clearly convinced that Maribarb executed

these papers and transferred the money to plaintiff in order to carry out the well fixed and settled plan of herself and three sisters to give plaintiff the major portion of their property if he remained with and cared for them until the death of the last survivor. That the transaction was consummated soon after the death of Mary, to our minds conveys no evidence of duress or undue influence, but, on the contrary, indicates that Mary's death, which was sudden, brought to the mind of Maribarb the necessity of carrying out the plan of herself and her deceased sisters.

The record in this case is a lengthy one, containing 594 pages. We have read it with care. Upon the hearing many witnesses were called on both sides. The evidence, while in conflict, strongly preponderates in favor of the plaintiff. The scrivener who drew the deeds, the witnesses who were present when they were executed, the intimate friends of the Wilhelms and their near neighbors bespeak the mental competency of Maribarb; others, among them the defendants and acquaintances of the Wilhelms, are of the opinion that she was mentally incompetent. Some reach this conclusion because she was reticent, did little talking during her entire life, others because she did not quickly recognize them, although it is admitted on all hands that she had lost the sight of one of her eyes and the other was somewhat affected; others had more or less tangible grounds for their belief.

Defendants and their witnesses seem to agree that she did not possess the mental acumen of Mary or some of the other sisters, but instruments, testamentary in character or effect, disposing of property, are not to be set aside merely because the grantors or testators are old or weak, or foolish, or lack the average mental capacity of their neighbors or relatives. If they possess sufficient mentality to know and understand the transaction in which they are engaged,

the extent and value of their property, those who are the natural objects of their bounty, are able to carry in their minds the general scope of the instrument and its effect, to whom they are giving and from whom withholding, they have the mental capacity to make such disposition, and if sufficient capacity exists it is not for the court to measure degrees of capacity or to indulge in comparison with other minds.

We are satisfied upon this record that Maribarb possessed sufficient mental capacity to plan and carry out each and all the transactions involved in this litigation, and that she did so; that there was no undue influence, fraud, or duress practiced upon her by plaintiff or any one else; that the disposition made by her of her property was her intelligent and voluntary act. It was not an unnatural disposition; in fact it was the most natural thing that she should dispose of her property as she did. It came down to her by survivorship of her sisters. They and she had had the services and companionship of plaintiff from the time he was 2 years old. She had some time yet to live and must be cared for, and expected the plaintiff and his wife to furnish such care. Under these circumstances she did the natural thing, the thing to be expected, the rational thing. There is not upon this record sufficient evidence to justify us in disturbing her acts, the great preponderance of it sustains her acts.

We agree with the circuit judge that the claim for reimbursement for expenses advanced to bring the sisters to this country set up by defendant Joseph Gitre is not established. The decree of the court below will be affirmed, with costs.

KUHN, C. J., and STONE, BIRD, MOORE, and BROOKE, JJ., concurred with FELLOWS, J. OSTRANDER and STEERE, JJ., concurred in the result.