WILCOX v. WILCOX.

1. DEEDS—CONTRACTS—DELIVERY.

Where a deed and contract for grantor's support and maintenance by grantees were executed at the same time, and the deed was placed of record and a copy of the contract was handed by the attorney who drew it to one of the grantees, there was a good delivery although thereafter grantor took charge of and kept both papers for their preservation.

2. SAME—INSANE PERSONS—CAPACITY TO BE TESTED AS OF DATE OF EXECUTION.

Mental incompetency to understandingly execute a deed and contract is to be tested as of the date of their execution.

3. SAME—DRUNKENNESS—DRUG ADDICT—MENTAL COMPETENCY.

Evidence of the use by grantor of intoxicating liquors and morphine, *held*, insufficient to establish mental incompetency to execute a deed and contract.

4. CANCELLATION OF INSTRUMENTS — DEEDS — INCOMPETENCY—UN-
    DUE INFLUENCE—EVIDENCE—SUFFICIENCY.

> In a suit by the children of grantor, after his death, to
> set aside a deed of a farm to grantor's brother and his
> wife in consideration of their making a home for him for
> the rest of his life, on the ground of mental incompetency
> and undue influence, the finding of the court below that
> plaintiffs had failed to meet the burden of proof that
> rested upon them, *held*, justified by the record.

Appeal from Branch; Chester (Guy M.), J. Sub-
mitted June 6, 1922. (Docket No. 3.) Decided De-
cember 29, 1922.

Bill by Elvin L. Wilcox and others against Griffin
Wilcox and another to set aside a deed. From a de-
cree dismissing the bill, plaintiffs appeal. Affirmed.

*L. F. Humphrey* and *W. Glenn Cowell,* for plaintiffs.

*Charles U. Champion* and *Palmer, Palmer & Palmer,*
for defendants.

STEERE, J. Plaintiffs are the son and daughters of
David Wilcox, deceased, who died intestate in Batavia
township, Branch county, on January 30, 1918. They
filed this bill to set aside a deed of a 40-acre farm in
said township given by him to defendants, his brother
Griffin Wilcox and wife, in 1910, under an agreement
that they would care for and support him during
the remainder of his life. Deceased was then 64
years of age and a widower. He thereafter lived with
them upon the land in controversy until his death.
The grounds alleged in plaintiffs' bill for the relief
asked, are mental incompetency, undue influence, want
of consideration by reason of defendants' failure to
properly care for and maintain deceased during the
remainder of his life, and that the papers were never
delivered to defendants. Defendants duly answered
in denial, and the case was heard on pleadings and

proofs taken in open court. After listening to the testimony produced by the respective parties and arguments of counsel the court dismissed plaintiffs' bill, saying in part:

"I am not persuaded that David Wilcox was mentally incompetent nor that he was unduly influenced in consummating the transaction in question in this case. I was quite impressed that he, David, made a good bargain when he made his arrangements with defendants in this case; and the evidence shows that defendants did not fail to perform their contract."

The 40-acre farm in controversy had been the home of deceased and his wife from the time they were married in 1865 until both were dead. At the time of their marriage it belonged to his wife. When they moved there it was mostly timber land, the scant improvements consisting of a small clearing and a poor upright of a house with a front room and two bedrooms downstairs. An old neighbor then living near described it as a "green 40" then worth from $400 to $600. In the years which followed deceased cleared the land, erected buildings, fenced and made an improved farm of it, upon which they made their living. and raised their three children, who are plaintiffs here.

Their son Elvin, the oldest, left home when 21 years of age and was 56 years old when this case was heard. Sarah, next younger, testified she was married in February, 1887, and left home the next fall. Serena, the youngest, was 41 years of age, married in 1898, then left home with her husband, returning after he deserted her in 1902, where she remained until she secured a divorce from him and was remarried to her present husband in 1904 when she again left and has since lived with him and their children.

In 1901, after their children were grown up, married and gone elsewhere to establish their homes, deceased's wife so conveyed title to the 40 acres in controversy as to create a joint estate between them

as husband and wife with right of survivorship. She told a neighbor she had done this to fix matters to secure her husband a home, for "if she didn't do something David would be turned out doors if she died first." She died in February, 1910, leaving him alone in their old home. The deed to defendants in issue here was executed October 1, 1910. At that time the place was worth from $3,200 to $3,500.

On the death of his wife David Wilcox personally attended to selecting a cemetery lot for her burial, paid the cost and fees, taking a receipt therefor. Later he procured a monument for her grave, obtaining time for a portion of the purchase price on which he afterwards obtained a discount of $3 by paying the same before it was due. The monument dealer with whom he transacted the business said: "I could not see anything wrong with him. He was about as close a buyer as I had at that time." In August of that year his son Elvin, who now claims his father was then mentally incompetent, lost a child and purchased a half of his father's cemetery lot, paying him $50 therefor and taking a deed.

Early in 1910, after the death and burial of his wife, deceased rented his farm for a year, making the deal himself, and held an auction sale of his personal property, also privately sold certain of his effects and some grain hauled to market. From these he realized over $700 in notes and cash which he deposited in the bank. In his auction and transactions in that connection his son Elvin assisted him. He conserved his funds deposited in the bank, and at his disposal, so that his account showed $396.03 to his credit when he died some 8 years later.

After disposing of his personal property and renting his farm he spent most of that spring and summer visiting his brothers and sister and his three married children. Elvin lived within a few miles of his old

home, his oldest daughter, Sarah McIntosh, in Flint, and the youngest daughter, Serena Baylis, on her husband's farm in Calhoun county. His brother Griffin was a mason by trade living in Coldwater and between his visits elsewhere he several times returned to Griffin's home. While visiting his sister at Mendon he wrote his son Elvin inquiring if he could live with them. Elvin replied his wife had recently left the hospital in which she had undergone an operation and they were not keeping house, but when she became able to do so he could live with them. He made a similar proposal to his daughter in Flint, but, as she explained, she did not think best to make any such arrangement so long as there was liquor in Flint. He also made his brother Albert a proposition similar to that he consummated with Griffin, but Albert had a place of his own and declined. He then told Albert he was going down to his brother Griffin, and eventually the agreement involved here was entered into. In the meantime he told certain of his old friends and acquaintances of his plans and arrangement with Griffin. During that summer he talked about it with a prominent citizen and former mayor in Coldwater whom he had long known and for whom his brother Griffin had done mason work, telling him of the death of his wife, that he had unsuccessfully tried to get some of his children to go on the old farm and keep him, and finally had arranged with his brother Griffin to go there and keep him for the rest of his life, for which he would have the place. Some time after his wife's death he told the undertaker, with whom he was well acquainted, that he was going over to Union and live with one of his children, and later in the season he called on him and said:

"Well, Charlie, I am back, I am going back to the old place where I will be at home. I have made arrangements with my brother Griff., who is going up

there to live with me and I am going to live with him, and whenever I am through whatever there is Griff. is to have."

These and similar statements to other old acquaintances and neighbors were made prior to the execution of the deed and accompanying agreement.

Late in September he went alone to the office of a reputable attorney who had formerly done professional work for him, and had been solicitor for his daughter in her divorce suit, stated to him the details of his arrangement with his brother Griffin and wife, requested him to draw up the proper papers and to be sure "that the thing was all fixed up solid for him." Pursuant to instructions the attorney drew up the deed from deceased to defendants, reserving a life estate, and a collateral contract in duplicate detailing their agreement, which obligated defendants to furnish a home and maintain deceased during the remainder of his life in consideration for the deed, giving them possession and use of the premises while performing their obligations. On October 1, 1910, the contracting parties went to the attorney's office together and executed the papers. The deed was thereafter duly recorded, and the attorney who drew the papers testified that when the papers were executed he delivered one copy of the contract in duplicate to deceased and one to defendant Ida Wilcox.

To refute delivery plaintiffs called Griffin Wilcox under the statute and against objection were allowed to show that when called as a witness in probate court he testified amongst other things that the papers were not delivered to defendants but David Wilcox received and retained both copies of the contracts, which were found amongst his papers after his death. The testimony of Ida Wilcox given in probate court (transcript of which was read into the record) is to like effect, her explanation being that "He (David) said,

'I will take them, you might destroy them.' " Those facts if true were equally within the knowledge of deceased. The attorney positively testified proper delivery was made of a duplicate of the contract to Ida Wilcox. If the deceased took charge of and kept both for their preservation after the attorney passed one to her, as he testified, it would have been a good delivery. But in any event the recorded deed was legally delivered. The contemporaneous contract which evidenced defendants' obligations to deceased as consideration for the deed was rightfully delivered to him and possession of the property it related to was given defendants by him, accepted and acted upon by both parties until his death. In any aspect of the question he made the delivery complete when he as a lessor put it beyond his power to rescind or dispossess them, in the absence of nonperformance on their part. 24 Cyc. p. 905.

Within about a month after papers were executed Griffin commenced repairs on the farm house which was old and in poor condition. He bought about $325 worth of new lumber, hired carpenters and worked on it himself, building an addition and making repairs at a total expense of approximately $1,100. He also later repaired the outbuildings at an approximate cost of over $200, as well as rebuilding fences and making other improvements. The following spring defendants settled upon the place with deceased, who occupied a comfortable room which he said he had picked out for himself. They thereafter lived there together until his death, and defendants still reside there. Outlining the circumstances surrounding the deal and in controversy the foregoing facts are sustained by the convincing weight of evidence and for the most part entirely undisputed.

Mental incompetency to understandingly execute the instruments in question is to be tested by de-

ceased's mental condition at the time they were executed. There is no evidence in the case that any one sought to persuade, or suggested to, deceased that he should make this agreement and disposition of his 40 acres. The only claimed evidence to that effect is inference from opportunity, and lack of mental capacity on his part to act understandingly in such a transaction.

Plaintiffs' proof directed to incapacity consists of testimony that their father was naturally of meager mentality and subnormal intelligence which he further weakened and clouded by years of habitual intoxication and use of morphine. Upon that subject the testimony of the respective parties is in direct conflict. It is fairly shown that he was given to drinking hard cider and at times other intoxicating liquor, to what extent is in dispute, and his daughter Sarah testified that he had taken morphine habitually since he seriously hurt his ankle when cutting stave bolts 38 years before; that her mother gave it to him at that time as did the doctor who attended him, and he thereafter continued its use until his death, in fact "was under the influence of morphine all the while." Although his use of liquor and morphine is not set out in their bill as a ground of incompetency, the three plaintiffs, who are the leading witnesses upon that subject, testify to it in the extreme. Against plaintiffs' evidence was abundance by apparently disinterested witnesses of long acquaintance with deceased directly to the contrary, both lay and expert.

Three physicians called as experts gave no testimony showing personal knowledge of deceased, his habits or mentality, but gave only opinion testimony based on hypothetical questions embodying facts stated by certain of plaintiffs' witnesses, to the effect that long continued habitual use of morphine and intoxicating liquor as stated in the questions would be so destruc-

tive of mentality and health as to render the user incompetent to intelligently transact business.

Of plaintiffs' expert witnesses, Dr. Schultz said in cross-examination:

"I would not want to take care of a man for eight years who had led such a life as Mr. Humphrey's question supposes for that property, said to be worth from $3,200 to $3,500. If he could make such a contract as that I would consider it a good business bargain on his part. * * * If he took a dose every hour for ten hours a day (as the testimony of his daughter Serena indicated), I don't believe a man could stand it. He would be taking 25 or 30 grains a day. At a rough guess I would say it would cost him between $150 and $200 a year."

Dr. Griffith was of the opinion that

"A man addicted to the extensive use of morphine and whisky for 25 years would be in pretty bad condition, if he were alive."

Dr. Baldwin said:

"If a person has taken morphine for 28 or 30 years in large quantities and accompanied it with alcoholic drinks in large quantities, the question would be, whether he would live that length of time. If he did, I wouldn't suppose the ordinary person would be competent to transact business. * * *

"I don't believe a man took that much morphine for 35 years and in addition a gallon of whisky every two months, a gallon alcohol every three months and two or three barrels of cider per year."

Defendants called two physicians who had known deceased for many years and at times professionally attended him and his family. Dr. Gamble, a practitioner of 29 years' experience, testified to knowing deceased for years and had treated him professionally on various occasions prior to 1911 and after, particularly in 1916-17 for enlargement of prostate gland and bladder irritation. Of his mentality he testified that deceased stated his symptoms—

"intelligently so I could tell what the trouble was. I never saw any evidence of mental incompetence, possibly limited understanding, intellectual caliber. I knew he was a farmer and had no reason to think he wasn't capable to transact the business that he was called upon to do, or to question his ability to transact business. I never knew anything about his taking morphine, never knew he had the habit. He may have taken some for relief of pain, I don't know about that. I think I would have been able to detect it in my relation with him as physician if he had been for many years an habitual user of morphine in any amount of any consequence. He might take a grain a day without showing any evidence of it. I never had any reason to think he took it. Never saw any evidence of it in his mental condition. Never detected any evidence of the influence of liquor."

Mr. Martin, a practitioner of 40 years, who had known deceased that long and been his family physician at times, attended his wife when she died, and also attended him in his last sickness at which time he found him in bad condition, mentally and physically, his trouble being enlargement of the prostate gland with terminating complications. Of his prior condition at the time of his wife's death and within two or three years after, and before his final sickness, he said:

"I saw nothing that seemed any different than it had 10 years before that. I didn't see any particular change up to that time. * * * I didn't see anything that led me to think he was not as competent as he ever had been; I don't know how competent that would be. As far as I know Mr. Wilcox carried on his business of the farm during the years that his wife was living."

Of his various old acquaintances and neighbors who testified as to deceased's competency, a few extracts are as follows:

Clarence Olds, who had known him well for many

years and was supervisor of that township for some time:

"I should say he was a man of rather decided opinions. He could not be easily influenced to make a bargain or disposition of his property which was against his interests or that he didn't want to make."

Samuel Wortz, who had known him since 1870 and formerly lived near him, had talked with him before the deed in question was executed about his arrangement with Griffin and asked him why he didn't live with his son, to which he replied, "He was homesick, and wanted to live on the old farm." Asked his opinion as to whether or not deceased was a man who would be influenced to make disposition of his property against his interests he answered:

"Well, I never thought he was, I thought he had a mind of his own. My judgment is that he was a man positive in his disposition. * * * I think he was a man with as strong mental faculties as the average man."

John Carter, who knew deceased ever since he could remember, said:

"I didn't see anything about him showing that he was not mentally sound. I think he was all level and capable of doing his own business. I never saw him take drugs."

Loren Keyes, who for 32 years lived near and had worked David's fields at times, testified:

"At the time Griffin moved on to the place, I should say David was competent to make a deed to dispose of his property. I didn't notice any change in his mental condition up to that time. He was drinking all right enough, I never saw him intoxicated. I never saw him take morphine or knew that he had the habit. Never noticed anything in his appearance to indicate it."

Charles Field, who had known deceased for upwards

of 40 years, lived about a mile from him and was often at his house, testified that David cleared the farm and managed it, never saw anything wrong with him and thought him capable of doing business. Considered him perfectly competent to enter into the transaction with Griffin in 1910; never saw him take morphine, nor a drink, but had seen him when he thought he had been drinking. He was rough spoken and what he knew he positively knew.

Charles Webb, who had known deceased for about 43 years and lived most of the time within a mile of him, testified:

"I never saw anything to make me think but what he was able to do his own business; for all I know he conducted his business on the farm. I never knew of his taking morphine."

Whatever his indulgencies might have been, and there is abundant disinterested testimony they were not noticeably excessive, in its final analysis the controlling question is his mental condition when he made the deal and executed the papers in controversy— whether he possessed sufficient intelligence to understand the transaction.

"Evidence of habitual drunkenness, old age, weakness of body, shortness of memory, and a few incoherent expressions is not sufficient to establish testamentary incapacity." *Hight* v. *Wilson,* 1 Dall. (U. S.) 94.

*Vide,* also, *Milks* v. *Milks,* 129 Mich. 164; *In re Walz's Estate,* 215 Mich. 118; *McIntire* v. *McConn,* 28 Iowa, 480; *In re Tacke,* 17 N. Y. St. Rep. 805 (3 N. Y. Supp. 198).

When deceased went to his brother Griffin and made this agreement the latter was living in his own home in Coldwater where he had established a trade and reputation which led a prominent citizen of that place to express regret at his leaving when told by deceased

of this agreement. After it was made deceased went alone to his attorney's office and told him what the agreement was in detail, had the papers drawn up as he desired and afterwards returned with his brother and wife to execute them. Although the burden of proof rests upon plaintiffs to show mental incapacity and undue influence the evidence is convincing to the contrary of both contentions. We see no occasion to disturb the conclusions reached by the trial court.

The decree is affirmed, with costs to defendants.

FELLOWS, C. J., and WIEST, MCDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.