HILLMAN *v.* HUITT.

THOMPSON *v.* SAME.

HUITT *v.* HILLMAN.

1. DEEDS—TEST OF MENTAL COMPETENCY.
    The test of mental competency to execute deed is whether grantor has sufficient capacity to understand in reasonable manner the nature and effect of act he is doing.

2. SAME—COMPETENCY WHEN DEED EXECUTED IS ISSUE.
    In suit to set aside deed on ground that grantor was mentally incompetent, where incompetency seems apparent at day of hearing, question is whether he was incompetent at time he executed deed, since even insane person may make valid conveyance during lucid interval.

3. SAME—ADEQUACY OF CONSIDERATION—COMPETENCY—UNDUE INFLUENCE.
    Where grantor with life expectancy of 6.6 years conveyed farm worth about $8,800 in consideration of his care and support during his natural life, reserving to himself life estate, consideration was not so inadequate as to indicate incompetency of grantor; nor would conveyance out of family denote incompetency where grantor had no moral or natural incentive or obligation to sacrifice his own comfort for his relatives.

4. SAME—BURDEN OF PROOF—SUFFICIENCY OF EVIDENCE.
    In suit to set aside deed on grounds of incompetency and undue influence, evidence *held,* insufficient to sustain burden of proof of grantor's mental incompetency at time deed was executed, or of undue influence.

Appeal from Allegan; Cross (Orien S.), J. Submitted October 22, 1929. (Docket No. 74, Calendar No. 34,471.) Decided December 3, 1929.

---

* Continued from Vol. 248.

Bill by Charles Hillman, as guardian of David F. Thompson, sometimes known as Frank D. Thompson, and another against Hazel L. Huitt and another to set aside a deed on the ground of incompetency of grantor, David F. Thompson. Bill by David F. Thompson against same defendants to set aside the same deed. Bill by Hazel L. Huitt and another against Charles Hillman and others to restrain trespassing on the premises in question. Upon hearing the three cases were consolidated. Decree for defendants as grantees under the deed. Plaintiffs appeal. Affirmed.

*Leo W.* and *Clare E. Hoffman* (*Carl E. Hoffman,* of counsel), for appellants.

*Perle L. Fouch* and *Harry C. Howard,* for appellees.

FEAD, J. These three actions, consolidated, present the question whether a deed executed on May 4, 1928, by David Thompson to Hazel Huitt should be set aside on the grounds that Thompson was mentally incompetent to make it and it was procured through undue influence. The deed covered Thompson's farm of 88 acres, about three miles from Allegan, and recited:

"It is understood and agreed that, as a part of the consideration of this deed, that said first party, David F. Thompson, reserves a life estate and as a further consideration, said second party agrees to support and care for said first party during his natural life."

Thompson was 73 years of age. His prospective heirs were his brother Barney, 70 years old, living in Detroit, his niece, Mrs. Dora Bailey, 58 years old,

living with her husband in Florida, and an unnamed and undescribed sister of Mrs. Bailey. Married many years ago, Thompson's wife had left him in a short time and was unaccounted for. There were no children. The financial condition of Barney Thompson and Mrs. Bailey was not shown.

David Thompson had acquired the farm partly by inheritance and partly by conveyance from his brother and sister. It was worth about $100 per acre. He was not a good farmer. For several years the farm had been worked by renters on shares. The buildings were dilapidated and unkempt. Part of the time Thompson lived on the farm and at other times boarded in Allegan. His life alone caused him to become neglectful and even unclean in person and home. Nevertheless, he was a good bargainer, and his general business capacity was indicated by the fact that, in addition to the farm, he had accumulated stock, implements, and personal property of the value of $800, and over $6,000 in cash, about $3,000 of which was in a bank which had failed in January, 1927. He also seems to have had a Liberty bond or two.

Dewey Huitt was 30 years old and his wife 25. They had two children, six and seven years old, respectively. They owned a home in Allegan, worth $3,000. Huitt worked for an express company at $112 per month. Thompson became acquainted with them about seven years before the hearing. In 1925 he loaned them $1,200 on a mortgage on their home, which they repaid in July, 1927. He occasionally went to see them. In the fall of 1927 he bought a Hudson car for their use. On February 25, 1928, he went from the farm to their home and stayed there until they all moved upon the farm on Easter day in April. He was ill part of the time.

The Huitts claimed it was during this period that Thompson made a proposition that they move on the farm, take care of him, and he would deed them the property, although he had talked about it in a general way several times before and had also spoken of making a will in favor of Mrs. Huitt. To make the house suitable for occupancy by a woman and children, Thompson had it repaired and conveniences installed.

A little later Huitt took Thompson to Detroit to visit Barney. Barney returned with them, stayed in the neighborhood a few days, and, on April 23d, filed a petition in probate court for Allegan county for the appointment of a guardian for David as an incompetent. David prepared for trial, was examined by two physicians, appeared at the hearing on May 25th ready to proceed, and Barney withdrew his petition. He then notified Mrs. Bailey, and on June 12th she came to Allegan, took possession of David, and kept control of him until final hearing. June 12th, she filed a new petition to declare him an incompetent and later inspired these suits to set aside the deed. Thompson was declared incompetent, and a guardian appointed June 27, 1928. The suits were heard August 10th, and the court held that Thompson was competent when he executed the deed.

The test of mental competency to execute a deed is whether grantor has sufficient capacity to understand in a reasonable manner the nature and effect of the act he is doing. 18 C. J. p. 218; *Davis* v. *Phillips,* 85 Mich. 198; *Hayman* v. *Wakeham,* 133 Mich. 363; *Demerse* v. *Mitchell,* 187 Mich. 683. This general statement has been amplified at times and the particulars are summed up in *Guntzviller* v. *Gitre,* 195 Mich. 695;

"If they possess sufficient mentality to know and understand the transaction in which they are engaged, the extent and value of their property, those who are the natural objects of their bounty, are able to carry in their minds the general scope of the instrument and its effect, to whom they are giving and from whom withholding, they have the mental capacity to make such disposition, and if sufficient capacity exists it is not for the court to measure degrees of capacity or to indulge in comparison with other minds."

The deed was drafted by George Wise, who was engaged in the real estate and insurance business and connected with an abstract office. The Huitts and Thompson came to his office together and Huitt said they wanted a deed made. Thompson told Wise some of his relatives wanted his property but he would not give it to them, that he wanted a deed made to Mrs. Huitt, with a life lease to himself, and that they would take care of him. He mentioned the number of acres, and on computing acreage from three deeds he handed to him, Wise found the number correct. Although Huitt was present part of the time, Wise also talked with Thompson in Huitt's absence, cautioned him it was a very particular matter and that he should not make any blind acknowledgments. Thompson told him he was better with Huitts than he had been for some time and realized what he wanted to do. Wise had talked with him hundreds of times and considered him as mentally competent as he ever had been. The form of the deed was Wise's selection, and the reservation was made as he thought it should be.

The attack on Thompson's mental capacity came from both lay and medical witnesses. The testimony of the lay witnesses ranged over a period of years

and demonstrated the undisputed fact that Thompson had peculiarities and limitations, the principal ones of which were claimed to have been: For a number of years he was unwilling to make sales of his own crops and stock and they were made for him by Barney or his tenants, and he accepted settlements for sales without computing them himself; he locked the door of his house on the inside and made a practice of going in and out of the window; shortly before he made the deed he took off his outer shirt in his own home, thought two small daughters of a neighbor had seen him through the window, became afraid that he was going to be arrested, talked about the incident frequently, and would go to the barn in January to sleep so he could not be found; sometimes instead of going from his house to the road he would go back of the buildings to avoid people; in 1926 he hid his pocketbook containing $50 or $100 under a bundle of cornstalks and forgot where it was; he was in the habit of boasting about his money and property; once, while under the influence of liquor, he left $300 or $400 at a grocery store and forgot it; he had a safety deposit box, left the key at the bank because he was afraid he might lose it, and did not keep track of the interest on deposits; on one occasion when he saw Dewey Huitt coming, he hid under the table; he used to ride with Huitt in his express wagon and became a sort of butt for the jokes of those who frequented the depot; he was not able to carry on an intelligent or connected conversation and sometimes had a silly grin on his face; he did not recognize people he had known for years; he used to trust neighbors to pay him the correct amount for gravel which they purchased from him; he had always been very close with money, and, although he had some $3,100 in the solvent banks in the summer of 1927, all of it was withdrawn by

May 5, 1928; only the sum of $1,215 has been accounted for and the rest cannot be found.

Defendants presented a large number of witnesses who had known Thompson for various terms of years and who testified to his mental competency. There were neighbors who lived across the road from him, two attorneys, a wall paper and paint dealer, furniture packer, carpenter, former tenant, hardware merchant, grocer, two other neighbors, a blacksmith, an automobile salesman, a laborer, a lifelong friend, an insurance agent, a mail messenger, and others, all of whom had transacted business or come in contact with Thompson about the time the deed was given and who had discovered no mental incompetency nor difference from his usual demeanor. Several of them had dealt with him in connection with the repair of his home for the occupancy of Mrs. Huitt. The business was not big, but it was such as he would ordinarily transact, as buying goods, hiring ordinary work or tenants, and he acted as usual. With others the contact was casual. With some of them he discussed his property, his money in the bank, and especially the deposit in the failed bank. George DeLano, 70 years old, who had known him all his lifetime, talked with him a long time on each of four nights in April, 1928, and saw no difference in him. E. W. Stone, an attorney to whom Thompson had gone to make a will six or eight months before the hearing, and who discussed the matter with him fully, testified he knew Thompson had mental capacity to comprehend the nature and extent of his property and those dependent on his bounty. He was not permitted to go into details.

Plaintiffs produced four medical witnesses who said Thompson had senile dementia or psychosis, was incompetent, and, in their opinion, had not been

mentally competent for a year. Drs. Mortér and
Yoder, who examined Thompson June 21st and
July 31st respectively, and again on the day of hear-
ing, were psychiatrists from the Kalamazoo State
hospital. Their testimony demonstrated a natural
difficulty in differentiating between the legal test of
competency and the, to them, more familiar medical
test. Dr. Kopprasch, a general practitioner, ex-
amined Thompson July 7th. Dr. Stuck, a general
practitioner, examined him July 6th. Dr. Stuck had
examined him in the first week of May in order to
testify in the proceedings brought by Barney. At
that time he gave his opinion that Thompson was no
different than he had been. He testified there had
been a definite change in his condition between the
two examinations. The psychiatrists were of the
opinion that Thompson could not have been com-
petent in May.

Opposed to plaintiffs' medical experts was Dr.
Shillito, 40 years a general practitioner, who had
examined Thompson in May and thought he was
mentally competent.

As far as the record shows, none of these physi-
cians applied the whole legal test of mental compe-
tency in examining Thompson as it is outlined in the
*Guntzviller Case.* Some of them, however, made
some inquiry of him regarding part of his property.
As they testified to it, he seems to have been fairly
clear about his farm, the property on it, and the
money in the bank which failed. However, he de-
nied to plaintiffs' experts that he had deeded the
farm and was confusing about the moneys he had
withdrawn from the banks. Thompson was put upon
the stand at the hearing and his examination there
disclosed the same characteristics. The doctors

thought this was due to incompetency rather than evasion.

The case is not entirely free from difficulty. The testimony of plaintiffs' experts and Thompson's examination on the stand seem quite persuasive that he was mentally incompetent at the day of hearing. But the question here is whether he was competent at the time he executed the deed. *Wilcox* v. *Wilcox,* 221 Mich. 290. Even an insane person may make a valid conveyance during a lucid interval.

It must be conceded that Thompson was mentally competent, at least while he was accumulating his possessions. This would take him into the year 1927. The peculiarities testified to by the lay witnesses do not show him to have been incompetent under the legal test. The change from competency to incompetency must have occurred at some time. Assuming he was incompetent at the day of hearing, the statement of the medical experts that he had also been incompetent for a year before the hearing was no more than an opinion of what his condition had been, without knowledge of what it actually was, at the prior time. Against that opinion are arrayed the testimony, based upon then present observation, of a large number of reputable citizens of the community, who have known Thompson for years and would have noticed some change in his capacity; the opinion of two physicians upon examination made immediately after the execution of the deed; the statement of Dr. Stuck that a definite change had occurred in Thompson's condition between the two examinations; the opinion of a lawyer, who would naturally apply the legal test and whose statement of competency was positive; and the testimony of the scrivener of the caution he used and Thompson's evident capacity.

Plaintiff's medical witnesses testified that the character of the contract would be an important factor in indicating incompetency, and counsel stress the deed as being without adequate consideration and of itself some evidence of an insane state of mind and undue influence. The doctors criticized it in that it should have been more specific in stating the kind of care Thompson was to get from the Huitts, and one of them deemed Mrs. Huitt's responsibility insufficient.

The scrivener was responsible for the language of the contract. Just how specific it should have been is not free from doubt. The instance has been known of where a lawyer's heart was gladdened by the liberal construction which a court gave to the general language he had used in a support agreement, and another of where specific details of care inserted in a contract arose to discomfort the attorney who drafted it. The record contains no imputation against the character of the Huitts. The deed itself was security for its performance. The value of the farm was not disproportionate to the worth of the care of Thompson if he lived his expectancy of 6.6 years and met the degree of helplessness which reasonably might be anticipated. The Huitts bound themselves to an uncertain number of years of servitude to him, to inconvenience in their home life, to sacrifice of the good of their children and loss of their freedom of action. We do not think the consideration so inadequate as to indicate incompetency.

Nor would conveyance out of the family denote incompetency. Thompson had no moral or natural incentive or obligation to sacrifice his own comfort for his relatives. He was peculiarly free to do as he pleased. The testimony disclosed no circum-

stances of poverty as to those related to him nor close companionship creating bonds of gratitude or affection which in the least stood in the way of his desire, natural at his age, to secure his future. There was testimony that he had refused to live with his niece because he wanted to stay on the farm. She had gone to Florida. His brother had left the neighborhood. When the desire to be taken care of came to him, it was not unnatural that he turned to others with whom his relations had been friendly.

If the Huitts had been cultivating Thompson's acquaintance for ulterior purposes, evidence of it would not have been lacking. The testimony is not abundant as to their relations. What there was indicated that Thompson himself sought the Huitts.

We think that upon the whole case plaintiffs have not sustained the burden of proof of Thompson's mental incompetency at the time the deed was executed, nor of undue influence.

The decree of the circuit court is affirmed, with costs.

NORTH, C. J., and BUTZEL, WIEST, CLARK, MCDONALD, POTTER, and SHARPE, JJ., concurred.