**STAR REALTY, INC. v. BOWER**

1. CONTRACTS—MENTAL CAPACITY—TEST OF CAPACITY.
   The test of mental capacity to contract is whether the person in question possesses sufficient mind to understand, in a reasonable manner, the nature and effect of the act in which he is engaged.

2. CONTRACTS—MENTAL CAPACITY—AVOIDING CONTRACT.
   It must appear not only that a person was of unsound mind or insane when the contract is made, but also that the unsoundness or insanity was of such a character that he had no reasonable perception of the nature or terms of the contract, before he can avoid the contract.

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 4] 17 Am Jur 2d, Contracts §§ 16, 17.
   41 Am Jur 2d, Incompetent Persons §§ 71, 72.
[3] 49 Am Jur, Specific Performance §§ 8, 9.
[6] 5 Am Jur 2d, Appeal and Error §§ 703, 704.

3. CONTRACTS—EQUITY—SPECIFIC PERFORMANCE—TRIAL COURT—DIS-
CRETION.

Granting of the remedy of specific performance of a contract
is a matter of grace resting within the sound discretion of
the court, to be exercised according to the well-settled prin-
ciples of equity as applied to the peculiar circumstances of
each case.

4. CONTRACTS—MENTAL CAPACITY—INTELLIGENCE.

Intelligence alone is not controlling in a determination of a
person's mental capacity to make a contract; what is signif-
icant is ability to use intelligence.

5. CONTRACTS—MENTAL CAPACITY—EMOTIONAL DISORDER.

The presence of emotional disorders is not by itself sufficient
to invalidate a contract on the grounds of mental incapacity,
but an emotional state that is able to overwhelm any intel-
lectual appraisal a person should make renders him lacking
the capacity to make a contract.

6. APPEAL AND ERROR—EQUITY—TRIAL COURT—FINDINGS OF FACT.

The Court of Appeals hears appeals of equity cases *de novo,*
but gives great weight to the findings of fact of the trial
judge and does not reverse unless it finds from a reading
of the entire record that it would have reached a different
result.

Appeal from Wayne, Harry J. Dingeman, Jr., J.
Submitted Division 1 October 10, 1968, at Detroit.
(Docket No. 5,575.)   Decided April 23, 1969.   Re-
hearing denied May 29, 1969.   Leave to appeal de-
nied February 24, 1970.   See 383 Mich 768.

Complaint by Star Realty, Inc., a Michigan corpo-
ration, against Donald B. Bower for specific per-
formance of an agreement to sell land.   Judgment
for defendant.   Plaintiff appeals.   Affirmed.

*Lampert & Fried,* for plaintiff.

*Cozadd, Shangle & Smith (B. Ward Smith* and
*Edward C. Johnson,* of counsel), for defendant.

BEFORE: J. H. Gillis, P. J., and R. B. Burns and J. J. Kelley,* JJ.

J. H. Gillis, P. J.   This appeal is from a denial of plaintiff's request for specific performance of an alleged contract to sell land entered into on March 23, 1967.   In denying the request, the trial court stated:

"In the opinion of this court, the matter can be decided upon the question of defendant's mental competency to enter into the contract with plaintiff. The test of mental competency to execute a contract for the sale of real estate has been stated and re-stated in many Michigan cases. * * *

"It is the opinion of this court that the defendant did not have sufficient capacity to understand in a reasonable manner the nature and effect of the act he was doing on March 23, 1967, and finds as a matter of fact that he was an incompetent person at the time the agreement to sell was entered into by him."

Plaintiff contends that the record does not support the finding of the trial court.

The well-settled test of mental capacity to contract, properly adopted by the trial court, is whether the person in question possesses sufficient mind to understand, in a reasonable manner, the nature and effect of the act in which he is engaged.   However, to avoid a contract it must appear not only that the person was of unsound mind or insane when it was made, but that the unsoundness or insanity was of such a character that he had no reasonable perception of the nature or terms of the contract.   See 17 CJS, Contracts, § 133(1); 2 Williston on Contracts (3d ed), Insane and Intoxicated Persons, § 256, p 94ff.

---

* Circuit Judge, sitting on the Court of Appeals by assignment.

Since incapacity on the part of a party to a contract may warrant denial of specific performance, (*Lynder* v. *Schulkin* [1943], 305 Mich 451), the only question for our determination is whether the finding by the trial court of mental incapacity to contract, when the above test is applied to the facts of this case, was proper. Specific performance is a matter of grace resting within the sound discretion of the court to be exercised according to the well-settled principles of equity as applied to the peculiar circumstances of each case (*Collins* v. *Collins* [1957], 348 Mich 320; *Blackwell* v. *Keys* [1958], 353 Mich 212).

At the time of trial in March, 1968, defendant was 25 years old. He graduated from high school in 1961 and went to work in the mail room of Ford Motor Company. In 1963, he enrolled at Henry Ford Community College under the Ford management training program where he attended night classes intermittently over a 2-year period. In March, 1963, he married. At the time of the marriage, defendant's wife was pregnant but lost the child in a premature birth 3 months later. In January, 1964, defendant's father died and the day after the funeral, his wife suffered a miscarriage of their second child. Only a few months later, defendant also lost his mother.

Defendant inherited the property in question from his parents. The land consists of 85 acres, 4 of which were the subject of a condemnation suit at the time this suit was filed. It was valued in his parents' estate at approximately $2,000 per acre. In addition, defendant inherited other real and personal property worth approximately $30,000.

After the death of his parents, defendant's behavior became quite erratic. He spent lavishly and often gave expensive parties. Marital troubles be-

gan to develop. In June, 1965, he left Ford and quit going to school. He had entered into a gravel lease on the subject property which he anticipated would yield a substantial income. He worked occasionally at restoring antique cars for which he was paid nothing. The rest of his time was spent in bars. Although his wife was working sporadically, for the most part they lived off the residue of his parents' estate.

In October, 1966, he returnd to Ford but left again a month later when he received his draft notice. He was rejected by the army, however, after a psychiatric examination revealed a nervous condition. After his rejection by the army, he was served with divorce papers by his wife.

Defendant needed money to clear up his debts and to carry him through his divorce. He was also contemplating the purchase of a bar. From December, 1966, to March, 1967, defendant contacted about a half-dozen real estate brokers for the purpose of selling the property. He received several offers from these brokers but rejected all of them because the offers were too low or the terms unsuitable. In early March he contacted Benjamin Rich, a real estate broker, and asked Mr. Rich whether he was interested in buying the property. Mr. Rich made an offer but defendant rejected it. Several weeks later Mr. Rich called defendant and told him that he had received an offer to buy the property which he thought might be acceptable to defendant. Defendant went to Mr. Rich's office where he was told of plaintiff's offer to purchase the property. The price offered was $100,000 with $25,000 down and the balance on land contract. This price was substantially below what the property was worth. Defendant advised Mr. Rich that he would discuss the offer with his attorney and return. He did not

discuss the matter with his attorney but returned that afternoon to Mr. Rich's office and signed an acceptance of plaintiff's offer. The closing was scheduled for approximately 10 days later but defendant failed to appear. Thereupon plaintiff, on May 1, 1967, commenced suit for specific performance of the agreement. In the meantime, guardianship proceedings had been instituted wherein defendant was declared mentally incompetent and a guardian appointed by the Wayne county probate court on May 9, 1967. Defendant answered plaintiff's complaint through his guardian and admitted the agreement but alleged that at the time of its execution defendant lacked the capacity to enter into the agreement.

In June, 1966, defendant went for the first time to see Dr. Gerald Dupler, psychiatrist. At trial, Dr. Dupler testified that after his initial interview with defendant he diagnosed defendant as an emotionally unstable person, i.e., one with feelings of insecurity and inferiority who tends not to assume responsibility, who overreacts to minimal stresses, tends to be impulsive and manifests physical reactions such as vomiting, tremulousness, and rashes. He placed defendant on tranquilizers and requested him to return for periodic psychotherapeutic sessions. Defendant did return again in June and once more in July. He did not return again until April 19, 1967, after the contract in question had been entered into. Dr. Dupler testified that at that time there was no change in his diagnosis and that although he found defendant to possess high average intelligence, his emotional responses were considerably less than average. He stated further that defendant's judgment or responsibility would be substantially impaired in any situation where there was stress in-

volved.  On direct examination, Dr. Dupler testified as follows:

"*Q.* (*By Mr. Johnson* [*attorney for defendant*]): The question doctor, is first of all, do you have an opinion whether or not he had the capacity to understand in a reasonable manner the nature and effect of his actions in entering into the sale of this real property and you answered that yes, you could form an opinion.  Now, would you tell the court what your opinion is.

"*A.* Your words are in a reasonable manner.  I think he can not do this in a reasonable manner.  I think that by the things that I said previously about the immaturity of his personality, about the instability of his personality, about his poor judgment, that he is incompetent to transact this kind of business activity.  Not so much on the basis of specifics; I think we could think of him as a child in that sense that a small child would know the numbers; the child would know what this is and what that is; but it seems to me that he doesn't put the facts together, which is what I tried to describe in my feeling that his judgment is impaired and therefore in this area that he is incompetent.

"*Q.* Now, doctor, in my question I asked did he have the capacity to understand in a reasonable manner the nature and effect of his actions in selling this real property, and it was to that question that you said that you could form an opinion.  Can you be more specific in your opinion on this person's ability to understand in a reasonable manner his actions in that hypothetical fact situation?

"*A.* It's difficult for me to answer.  I think I didn't examine him at that very moment; therefore, perhaps my answer is somewhat hypothetical, too.  But if we assume that this situation was a highly charged, emotional, pressured situation for this patient, I would feel that his ability to understand would not be present—would be defective, I might say that—on the basis of the fact that his emotional

behavior would overwhelm any—I think—adequate intellectual appraisements that he should make."

Robert Porter, a cousin of defendant, testified as to defendant's behavior in the hospital after an automobile accident which occurred the day after the contract was signed. Mr. Porter stated that defendant broke down and cried about his condition; that his appearance was unkempt, unshaven and dirty; that he was fighting with his wife over the divorce; that he was drinking quite a bit and that he was completely in debt and "flat broke." Mr. Porter testified that defendant's despondency continued and that he made threats against his wife's new boyfriend. According to Mr. Porter, defendant would break down, cry and become incoherent. He lacked self control. His emotions would run from anger to very low fits of depression. He suffered from gastrointestinal distress, nausea, throwing up—he couldn't retain food and was constantly broken out in a rash. His business and personal behavior was erratic.

John Senninger, a friend of defendant, testified that from before Christmas, 1966, until March, 1967, when the contract was entered into, defendant drank heavily. His personal belongings, his machinery and equipment, his cars and his house all deteriorated because he didn't take care of them. Senninger also testified that defendant was prone to fits of violence and often made threats against others.

Wallace Arrowsmith, defendant's guardian, corroborated the observations of Messrs. Porter and Senninger.

Defendant took the stand and testified that when he signed the agreement to sell he thought he knew what he was doing. On cross-examination he replied that he knew the extent of the property to be sold,

what its valuation was in his parents' estate and what the terms of the agreement with Mr. Rich were.

In urging that the trial court erred in finding defendant lacked sufficient mental capacity, plaintiff contends that not only does the record fail to support a finding that the defendant did not understand in a reasonable manner the nature and consequences of his act but that defendant's testimony, coupled with his seemingly knowledgeable attempts to sell the land on other occasions is proof to the contrary. Plaintiff urges that defendant's intelligence is the essence of his capacity to contract, *i.e.*, as long as defendant had sufficient intelligence to understand the nature and consequences of the sale, he must be held to it.

In support of this position plaintiff cites *Davis* v. *Phillips* (1891), 85 Mich 198, and *Hillman* v. *Huitt* (1929), 249 Mich 1. *Davis* dealt with an attempt to set aside a deed which had been executed in consideration for an interest in certain patents. In dismissing the complaint, the Court stated:

"While weakness of mind is an important element for the consideration of the court in determining the nature of such transactions, yet weakness of mind alone is not sufficient to warrant the setting aside of a contract otherwise valid and free from any taint of fraud. There are many degrees of competency, but business transactions are not to be measured by degrees. The sole question always is, had the party sufficient intelligence to understand the transaction. * * * The testimony of the complainant himself shows that he was possessed of sufficient intelligence to understand the character of this transaction." *Davis* v. *Phillips, supra,* 202, 203.

The only medical testimony in *Davis,* however, was that of a physician, not a psychiatrist, who had

treated plaintiff only for a fever but who had offered an opinion as to plaintiff's mental competency.

In *Hillman,* the test of mental competency adopted, citing *Davis,* was "whether grantor has sufficient capacity to understand in a reasonable manner the nature and effect of the act he is doing." *Hillman* v. *Huitt, supra,* p 4. The Court in *Hillman,* in dismissing the allegation of mental incompetence, rejected the testimony of 2 psychiatrists in support thereof primarily because their examinations of the alleged incompetent occurred some time after the transaction in question.

It is conceded that defendant is of high average intelligence. Intelligence alone, however, is not controlling. Notwithstanding the language in *Davis,* the later and more accurate statements of the test of mental capacity do not focus squarely on intelligence. What is significant from a legal standpoint is capacity, *i.e.,* how defendant is able to utilize his intelligence. In contrast to the situations in *Davis* and *Hillman,* defendant was examined by a psychiatrist before and after the time he entered into the agreement. Dr. Dupler's unrefuted testimony is that it is quite possible for a person to be intelligent and still lack the capacity to understand in a reasonable manner the nature and consequences of his act. He described defendant as one who could easily understand individual facts but because of impaired judgment could not relate the facts or put them together. Defendant, therefore, might know the acreage of the property, its value in his parents' estate and the terms of the sale, but still not be able to comprehend all these facts in combination. Thus defendant's intelligence alone does not necessarily equip him with the understanding requisite to a valid contract.

Plaintiff contends further that the testimony of defendant's erratic personal and business behavior tended to prove an emotional or personality disorder which in no way affected defendant's mental competency to contract. We agree that just as intelligence alone will not validate a contract, neither will emotional disorders alone invalidate a contract. But if a person is unable to understand in a reasonable manner the nature and consequences of his act, he lacks capacity and there ends our inquiry. We are not concerned with what impairs capacity. There is considerable testimony of emotional instability on the part of defendant. While plaintiff urges that such testimony is immaterial, there is unrefuted testimony by Dr. Dupler that defendant's emotional state could overwhelm any intellectual appraisals that he should make. In such case defendant would lack capacity to contract.

The integrity of written contracts must be preserved but so must an incompetent be protected against his own folly. Each case of this type must be decided on its own facts. The trial judge heard the testimony of Messrs. Porter, Senninger and Arrowsmith regarding defendant's deteriorated condition and of Dr. Dupler that this condition could render defendant incapable of understanding in a reasonable manner the nature and consequences of the sale. The trial judge also heard defendant's own testimony and was informed of defendant's rejection of other offers to buy the property in question.

The evidence presented does not preponderate for specific performance as equitable relief. The trial court observed each witness and applied the proper test of capacity to contract to the facts presented. We accordingly place great weight on the trial court's findings and we are not persuaded to disturb

them.  *Winiecke* v. *Scheurer* (1966), 3 Mich App
178; *Nicpon* v. *Nicpon* (1968), 9 Mich App 373.
  Affirmed.  Costs to appellee.
  All concurred.